**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**UNITED STATES OF AMERICA**

**v. CRIMINAL ACTION NO. 2:22-00112**

**WILLIAM LAWRENCE BRYANT**

**MEMORANDUM OPINION AND ORDER**

**This matter is before the court on Defendant's Motion to Suppress the Defendant's Illegal and Involuntary Confession, filed August 18, 2022, as well as the United States' First Response in Opposition to Defendant's Motion to Suppress Evidence, filed August 25, 2022, and the evidentiary hearing conducted thereon on September 13, 2022, including the transcript of the one hour and forty-one minute audio recording of the law enforcement interview of the defendant conducted by law enforcement officers, received and filed on October 3, 2022, following which there was filed the defendant's Supplemental Brief in Support of William Lawrence Bryant's Motion to Suppress, filed October 11, 2022, and the United States' Sur-Reply to Defendant's Supplemental Brief in Support of Motion to Suppress Evidence, filed on October 17, 2022.**

The court makes the following findings of fact, by a preponderance of the evidence, and conclusions of law.

On April 1, 2022, a search warrant had been issued the preceding day for the Fayetteville, West Virginia residence of the defendant's father where the defendant was living at that time. On that date, at about 11:45 a.m., in the apparent hope of luring the defendant out of the house and away from the computers and electronic devices through which child pornography was likely being received, three law enforcement officers engaged in a ruse just before the warrant was executed. They appeared at the residence, each dressed in the brown outer coat of a United Parcel Service employee. One of them, FBI agent Jared Jankowski, went onto the porch and to the front door with a package while the other two stood just off the porch. When the defendant answered the door, he was asked to sign for the package and, as he was about to do so, the officers identified themselves as such and he was escorted off the porch. The defendant, dressed in pants but shirtless, turned his back to the officers with his hands behind his back so that he could be handcuffed which then occurred.

At that time, there was a light snow on a cold morning with the temperatures just below freezing. The defendant was directed to a van a few feet away on the driveway where he sat on the bumper of the van for five or more minutes while engaged in small talk with Jankowski. The defendant was then led to a nearby heated SUV where the handcuffs were removed. He was directed to the rear seat while TFO Jillian Yeager, a West Virginia State Trooper, sat in the driver's seat. The SUV was an unmarked vehicle without special equipment such as a cage or bars. Genevieve Baushke, an FBI agent, sat in the front passenger seat and, unknown to the defendant, recorded the entire interview that would occur over the next hour and forty-one minutes. Both officers were armed but Yeager's firearm was covered by her jacket and out of sight while Baushke's firearm may have been visible to the defendant. One of the officers left to go into the residence to find a jacket for the defendant which she quickly brought back and gave to him.

During defendant's time on the van's bumper, he could see at least twelve officers, dressed in jackets or shirts with the letters FBI on the front and back, pour out of the van, each with a firearm holstered or held to the chest but raised as

**they entered the residence to sweep it for safety. The sweep took about five minutes, during which the defendant's father was ushered to the porch and eventually departed the scene, reportedly going to his brother's residence.**

**When the defendant was being moved to the SUV, Yeager and Baushke informed him that they "were going to answer any questions that he had and that [they] had a few questions as well" and that they would explain why they were there.**

**Once in the van, Yeager commented, "We're gonna let them grab their stuff and then we'll go." The following exchange then occurred:**

> **Baushke: Alright so, I am Special Agent Genevieve Baushke. Um, I work with the FBI obviously. And this is—did you already introduce yourself?**
>
> **Yeager: Mmm, um I am Trooper Yeager. I work with the FBI on their taskforce. Okay. I am a task force officer, and I work the crimes against children unit for the state police.**
>
> **Baushke: So, we work a bunch of cybercrimes. Um, I know a lot has been thrown at you and I just want to reiterate again that if we need to like slow down, you need to ask some questions, we're gonna get all of your questions answered hopefully.**

**Bryant: Okay. I'll let you know if I (unintelligible).**

**Baushke: Okay, but again you're not under arrest. We put you in handcuffs just for your safety, our safety. You're not super special, we literally do it every time.**

**Bryant: Yeah, and I appreciate that we're—**

**Baushke: Yep.**

**Bryant: I promise we're not gonna have any problems. I appreciate that.**

**Baushke: Ok perfect. That being said, you can leave at any time from this interview that we are gonna do. But that also being said, you can't just hop out the car, go running around.**

**Bryant: Obviously**

**Baushke: Yeah, we'll get you to a comfortable spot where you're not in everybody's way. OK?**

**Yeager: Just until the search is concluded.**

**Baushke: Yep. So today we have a search warrant for your residence. Um so we work crimes against children, we work a bunch of computer crimes as well. So, we wanna give you the opportunity to be as honest as you can. Like I said we're the FBI. When we build cases it's not like local PD where they, you know, run and gun and it's turn-over cases like that.**

**Bryant: Oh yeah, absolutely.**

**Baushke:** We're in it for the long haul man… So, we've been watching you for a while, and I gotta bunch of stuff on you, which is surprising because you don't have a criminal history. Um, so we're here today to give you the opportunity—because we're gonna find everything in your house.

**Bryant:** Ok.

**Baushke:** Ok.

**Yeager:** I always like to lead with this, anytime I interview anybody. Always take into consideration that we know a lot more than we are telling you at the time. Like she said we've been watching you for a while, you might even recognize her from the store you work at from a couple of weeks ago.

**Bryant:** Yes.

**Baushke:** The gas station. You helped me out with my granola bar.

**Bryant:** Yes.

**Baushke:** (Laughter) Thanks man.

**Yeager:** So, we've been eyeballing this for a while, so the questions that we ask you, a lot of times we already know the answers to. We're just gauging your cooperation because your cooperation goes a really long way, okay? It really does.

**Bryant:** I understand.

**Baushke:** Ok. So again, you're not under arrest we don't have any plans of taking you to jail or anything like that today. Cool? So, to start off like we said we work a lot of computer crimes. So, what kind of internet do you have?

The interview that followed focused on defendant's computers, their use by him to view and acquire images of and distribute child pornography as well as his sources and contacts to do so. Also covered was the extent to which he may have abused minors and when he may have done so. The interview was lengthy and as thorough as the interrogators could make it. No Miranda warnings were given.

Although the scene at the residence, as depicted first above, was likely a somewhat intimidating one for the defendant, the exchange between the two officers and the defendant was, for the entirety of the one hour and forty-one minutes, cordial. The interviewers at the outset explained why they were there and indicated the broad scope of the examination they would be making. The demeanor and tone of the two officers throughout was reasonably pleasant and mild. The defendant in turn was compliant and forthcoming.

The introductory phase of the interview is quoted above. The defendant was told at the outset that he was not under arrest and that the some five-minute period during which

**he was handcuffed was for his safety and that of the officers and was routine in these situations.**

**During the introductory phase the defendant was also told by Baushke:**

> **you can leave at any time from this interview that we are gonna do. But that also being said, you can't just hop out the car, go running around.**

**to which the defendant responded, "Obviously," followed by Baushke saying:**

> **Yeah, we'll get you to a comfortable spot where you're not in everybody's way. OK?**

**and Yeager adding:**

> **Just until the search is concluded.**

**The defendant was then told a second time during the introductory phase that he was not under arrest when Baushke said:**

> **so again, you're not under arrest we don't have any plans of taking you to jail or anything like that today. Cool?**

**While Baushke, in the course of informing the defendant that he could leave the interview at any time, added "you can't just hop out the car, go running around," the context in which that statement was made, including the follow-up remarks of the officers above quoted, made it apparent to the defendant that if he left the interview, he could not return to the residence until the search was concluded and that he could not interfere with the officers conducting the search. Otherwise, the defendant was thereby informed that he was free to leave and move about as he wished.**

**About one-fourth of the way through the interview, the defendant asked for a break which he was promptly afforded along with the opportunity to leave the SUV which he declined. Indeed, it became apparent that the defendant did not wish to confront his father at the time of the interview. The interview thereupon proceeded to its end in the same cordial manner.**

**The totality of the circumstances objectively establish that a reasonable person in the defendant's position would not have perceived that his freedom of action was, at the time of the interview, curtailed to a degree associated with**

**formal arrest. From the outset of the interview the defendant was repeatedly advised that he was not under arrest and could leave at any time. The defendant was not arrested until June, 2022.**

**Accordingly, it is ORDERED that the motion to suppress the defendant's statements at the interview, be, and it hereby is, denied.**

**The Clerk is directed to forward copies of this order to the defendant and all counsel of record.**

**DATED: December 12, 2022**

John T. Copenhaver, Jr.
Senior United States District Judge